# United States Court of Appeals
## For the First Circuit

---

No. 21-1069

ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all
others similarly situated; JAMES PEHOUSHEK-STANGELAND; ANDOVER
COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN; ARNOLD
HENRIQUEZ; MICHAEL T. COHN; WILLIAM R. TAYLOR; RICHARD A.
SUTHERLAND,

Plaintiffs,

v.

STATE STREET CORPORATION; STATE STREET BANK AND TRUST COMPANY;
STATE STREET GLOBAL MARKETS, LLC; DOES 1-20,

Defendants.

---

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP,

Interested Party, Appellant,

v.

LABATON SUCHAROW LLP; THORNTON LAW FIRM LLP; KELLER ROHRBACK
LLP; MCTIGUE LAW LLP; ZUCKERMAN SPAEDER LLP,

Interested Parties, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

---

Before

Thompson, Kayatta, and Barron,
Circuit Judges.

---

Samuel Issacharoff for interested party, appellant Lieff Cabraser Heimann & Bernstein, LLP.

Theodore H. Frank, with whom M. Frank Bednarz was on brief, for amicus curiae Hamilton Lincoln Law Institute.

———————————————

February 9, 2022

———————————————

**KAYATTA**, **Circuit Judge**.    Lieff Cabraser Heimann & Bernstein LLP served as one of the principal law firms representing a class of investors in a very successful challenge to charges imposed by State Street Bank and Trust Company on foreign exchange products.  This appeal arises from the post-settlement process of apportioning a $300 million recovery between the class and its lawyers.  The district court ultimately awarded a handsome $60 million fee to the lawyers representing the class.  In so doing, though, the district court opined that class counsel, including Lieff's lawyers, engaged in misconduct.  Specifically, the court faulted Lieff for using a template for its fee declaration that misleadingly indicated that it regularly charged paying clients the rates supporting its lodestar, for failing to exercise reasonable care in contributing to a suspect $4.1 million payment to a lawyer in Texas, and for materially misrepresenting a study regarding typical fees awarded in similar cases.  For the third misstep, the district court formally sanctioned Lieff under Federal Rule of Civil Procedure 11(b), though without any monetary penalty.

Lieff now appeals.  For the following reasons, we affirm the district court's Rule 11(b) sanction of Lieff.  We otherwise dismiss as unappealable Lieff's challenges to the district court's criticisms of its actions.

**I.**

In 2011, Lieff, along with Thornton Law Firm LLP and
Labaton Sucharow LLP, filed a class action complaint in the
District of Massachusetts on behalf of the Arkansas Teacher
Retirement System and other similarly situated institutional
investors, alleging that the investors' custodian bank overcharged
them for foreign currency exchange products in violation of the
bank's fiduciary, contractual, and statutory duties.  The district
court appointed Labaton interim Lead Counsel for the plaintiff
class, see Fed. R. Civ. P. 23(g)(3), and deemed Thornton "liaison
counsel" and Lieff "additional [c]ounsel."

After five years of litigation and mediation, the
parties reached a settlement-in-principle for $300 million.  In
2016, the district court preliminarily approved the settlement and
set a date for the final approval hearing.  At that hearing, the
court certified the class and found that the settlement was "fair,
reasonable, and adequate."  The court then turned to the subject
matter of this appeal: allocating a portion of the class recovery
to class counsel for costs and fees.  Relying on representations
made by class counsel in briefings and at the hearing, the district
court decided to award class counsel nearly $75 million (plus
interest), equaling approximately 25% of the total recovery.  The
court made that ruling after being assured by plaintiffs' counsel
that such an award was "right in line" with an empirical study by

Professor Brian Fitzpatrick of Vanderbilt University that analyzed
the mean and median fee awards in hundreds of class actions.  See
Brian T. Fitzpatrick, An Empirical Study of Class Action
Settlements and Their Fee Awards, 7 J. Empirical Legal Stud. 811,
835-36 (2010).  The district court also considered the lodestar,
i.e., the reasonable value of the hours counsel worked on the case.
As support for a total lodestar of $41 million, each plaintiffs'
attorney, including Lieff, detailed for the court the hours its
attorneys had spent on the case and their hourly rates.  Lieff's
portion of the lodestar came out to $9.8 million.  A Lieff attorney
declared under penalty of perjury that the rates it provided were
"the same as [Lieff's] regular rates charged for their services,
which have been accepted in other complex class actions."

      These representations by Lieff (and other class counsel)
turned out to be problematic.  The first crack in the foundation
supporting the original fee award was exposed by the press.  An
investigation by the Boston Globe Spotlight team revealed that
class counsel, including Lieff, had double-counted (using
different rates) the same hours billed by the same contract
attorneys in their lodestar calculations.  Lieff tells us that the
amount of double counting was "negligible," but records show the
total double counting by the several firms was over $4 million.
Additional concerns were raised about the accuracy of the fee
representations made by class counsel.  Trying to get ahead of the

story, Labaton, on behalf of class counsel, filed a mea culpa
letter with the district court admitting to the double counting
but nevertheless maintaining that the 25% award was still
reasonable and should not be disturbed.  (The letter did not
mention any of the other issues with the fee that came out later.)
The full Globe report was published the following month.
Confronted with the substantial double counting in the fee
submissions, the district court understandably lost confidence in
its ability to rely on class counsel's representations regarding
a reasonable fee award.  So, with the consent of the parties, the
court appointed a special master to look into the matter.

        The special master's investigation confirmed the gist of
the Globe's reporting.  The investigation also revealed a second
major flaw related to the original award.  The special master
learned that lead class counsel, Labaton (with contributions from
the others, including Lieff), had paid $4.1 million to a lawyer in
Texas, Damon Chargois, who appears to have been paid to entice
Arkansas public officials to retain Labaton as counsel to bring
this lawsuit.  As the district court later summarized, Chargois
earned his $4.1 million piece of the pie through "considerable
favors, political activity, money spent and time dedicated in
Arkansas."  This type of expenditure, the special master
concluded, violated ethics rules as applied in a class action (a
matter on which we need offer no opinion).  Overall, the special

master recommended that attorneys return between $7.4 and 8.1 million to the class, through various sanctions and fee reallocation.

On a parallel track, the district court also asked an amicus curiae to address the reasonableness of the $75 million award. In addition to echoing most of the special master's critique, the amicus flagged counsel's representations regarding the Fitzpatrick study. The amicus contended that class counsel had misled the court by stating that a 25% award was "right in line" with the Fitzpatrick study's findings, when the reality was quite different. While the study did state that attorneys' fees are about 25% on average for all class action settlements analyzed, Fitzpatrick found that "fee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent." Fitzpatrick, supra, at 838. Accordingly, Fitzpatrick concluded, "[f]ee percentage is strongly and inversely associated with settlement size among all cases." Id. at 837. For settlements between $250 million and $500 million, the study found that the mean and median awards were 17.8% and 19.5%, respectively. Id. at 839 tbl.11. Because 25% is not "right in line" with these figures, the amicus argued that class counsel had misrepresented the Fitzpatrick study.

Understandably concerned that its initial award of $75 million may have rested on suspect footings, the district court vacated that initial fee award in order to redetermine the award from scratch. It scheduled a three-day hearing to consider whether the initial fee award was nevertheless reasonable and whether class counsel's lodestar was accurate and reasonable. The court identified specific issues to be addressed at that hearing. As relevant to the issues now raised by Lieff in this appeal, the court asked the parties to be prepared to address:

> (1) . . . whether the initial fee award . . . is reasonable. Among other things, the participants shall be prepared to address whether Customer Class Counsel misrepresented [the Fitzpatrick] study in their memorandum in support of attorneys' fees. . . .
>
> (2) . . . whether Customer Class Counsel's reported lodestar, not including double-counted time, is accurate and reasonable. Among other things, the participants shall be prepared to address whether: contract attorneys should be treated as an expense and, therefore, not be included in the lodestar; Customer Class Counsel reported reasonable rates for staff attorneys in their fee petition; and Customer Class Counsel made errors other than double-counting time in their fee petitions.
>
> . . .
>
> (4) . . . Damon Chargois . . . .

(internal footnotes omitted).

After further briefing and consideration, the court again awarded a fee. The court found that an award between 20-30%

of the roughly $300 million total recovery would be reasonable. Within that range, it settled on 20% ($60 million) rather than the previous award of 25% ($75 million). To justify the award, the court considered the corrected lodestar and referred to the means and medians shown in the Fitzpatrick study for settlements of the size achieved in this case. The court also took "into account the proven misconduct of certain counsel in deciding where within the reasonable range to award such fees." In so doing, it referred primarily to the conduct of Labaton and Thornton. It found that while Lieff's conduct "was also deficient," it was "not as serious as the misconduct" of the other two firms. The court faulted Lieff for turning a blind eye to the Chargois payment; for using a template for its fee declaration that misleadingly implied that it actually charged paying clients the rates supporting its lodestar (when it did not); for failing to review its co-counsel's fee declaration to ensure the hours paid were not double counted in its own declaration; and for permitting a misleading picture of the Fitzpatrick study to be presented to the court under its name. The court also declared, based solely on the statement concerning the Fitzpatrick study, that Lieff violated Rule 11(b).

The district court then decided to exercise its discretion to apportion the new fee among the firms representing the class, something it had not done with the original $75 million award. In so doing, it awarded Lieff a greater percentage of the

total award than Lieff had been prepared to receive under its arrangement with the other firms. All in all, though, because the total award was about $15 million lower than the vacated award, Lieff was awarded approximately $1.14 million less than it would have received under the vacated award. Only Lieff appealed.

On appeal, Lieff asks us to reverse what it contends are three findings by the district court criticizing its performance: (1) that the firm violated Rule 11(b) by presenting the fee memorandum containing the allegedly misleading representation of the Fitzpatrick study; (2) that by using (without revising) a fee template prepared by lead counsel, Lieff ended up making false and misleading representations about the rates charged by its attorneys; and (3) that Lieff by "its inaction and acquiescence contributed to" the Chargois issue, and in so doing "facilitated Labaton's violation of the Massachusetts Rules of Professional Conduct." As to fees, Lieff explicitly disavows any challenge on appeal to the total award. It also makes no argument that a greater share of that total should be reallocated from the other firms to Lieff. Rather, as we will discuss, it asks that up to an additional $1.14 million be given to Lieff from any funds left over after processing claims of class members.

The other firms opted not to participate in the appeal, presumably because its outcome was of insufficient interest to them given Lieff's assurance that it was not challenging the

reasonableness of the total fee award or the allocation of that award among the firms.  Nor did any party seek to participate. This led the district court itself to request to defend its ruling and represent the interests of the class on appeal.  The amicus who participated below, under a new name, made a similar request. We granted the amicus's motion to file a brief and denied the district court's participation.

Amicus challenges Lieff's appeal on two fronts.  First, it claims we do not have appellate jurisdiction over Lieff's claims to the extent that the district court merely criticized Lieff's performance without imposing any sanctions.  Second, it contends that, on the merits, the district court's criticisms and Rule 11 sanction were appropriate.

## II.

We start with our appellate jurisdiction.  For reasons that will become clear, we divide Lieff's challenges into two categories: the district court's finding that Lieff violated Rule 11, and the district court's statements -- unconnected to any express finding of a Rule 11 violation -- that criticized Lieff for the lack of accuracy in describing its lodestar amount and for not having adequately investigated the basis for the large payment to Chargois.  As we will explain, we plainly have appellate jurisdiction to review the formal finding of a Rule 11 violation. The question, though, is whether we also have jurisdiction to

review the latter group of criticisms unconnected to any such finding.

Under controlling circuit precedent, a district court's "findings [of attorney misconduct], simpliciter, are not appealable." In re Williams, 156 F.3d 86, 87 (1st Cir. 1998). So when attorneys seek to vacate "criticisms of the attorneys made in the course of [a court's] opinion" and "nothing more," there can be no appeal because such unadorned criticisms do not "comprise a decision, order, judgment, or decree." Id. at 89 (citing 28 U.S.C. §§ 158(d), 1291).

Discerning the line between non-appealable derogatory comments about a lawyer's conduct and appealable findings of misconduct is not easy conceptually. Certainly a patina of formality adds to the brief for allowing an appeal because it enhances the sense that the attorney has done something seriously wrong. Perhaps for that reason, we have held that an explicit "censure" and "admonition" are enough to obtain appellate review even in the absence of an express Rule 11 finding. Young v. City of Providence ex rel. Napolitano, 404 F.3d 33, 38 (1st Cir. 2005).

In this instance, however, the district court eschewed any such formal declaration of censure, reprimand, or admonition for any of Lieff's actions other than the description of the Fitzpatrick study. We think it significant that the criticisms of Lieff concerning the Chargois fee and the Labaton fee template

are included in an opinion confirming formal Rule 11 sanctions based on other conduct.  That context makes clear to the reader that the judge did not find Lieff's conduct concerning the Chargois fee or the fee template as meriting any formal censure of any type, rather he merely made the kind of "criticism" that we have deemed not to be appealable.

Lieff suggests that the district court relied in part on its criticisms of Lieff to calculate a fee award that was lower than it otherwise would have been.  If that were so, Lieff could have simply appealed the fee award and, in so doing, secured review of any findings -- including any criticisms -- upon which the award rested.  See In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 982 F.2d 603, 610 (1st Cir. 1992) ("[A]n order which definitively resolves claims for attorneys' fees and expenses payable out of a common fund is . . . appealable.").  Lieff, though, repeatedly assures us that it is not appealing the court's total fee award.  Nor does Lieff ask us to review the apportionment of fees awarded each firm out of that fee award.  To the contrary, Lieff assures us -- and presumably co-class counsel -- that it "does not seek any readjustment of fees awarded to anyone else."

Lieff nevertheless asserts that if we set aside all of the district court's criticisms of Lieff's conduct, Lieff might be entitled to receive some money out of the funds awarded to the

class if any such funds remain unclaimed by class members.  But
this is classic doublespeak:  Any additional payment to Lieff
would by definition increase the fee award and reallocate the
award.  There is no third, "other" applicable option for approving
a payment to class counsel out of the settlement proceeds.[1]  And
having assured all interested parties that it is not appealing the
total fees awarded, or its share of the total, Lieff cannot now
seek both an increase in fees awarded and a greater share for
itself.  In any event, it made no attempt to convince the district
court to apportion any "leftover funds" to it.  Rather, it only
sought either a larger total award or a larger apportionment, both
of which it expressly disavows on appeal.

---

[1] Lieff does not offer any support for the notion that any
"unclaimed" settlement funds can go to counsel for the class as
something other than an increase in the fee award.  To the
contrary, "[t]here are four common ways of distributing unclaimed
funds":

- Reversionary fund -- Unclaimed funds
  revert to the defendant.
- *Pro rata* redistribution -- Unclaimed
  funds are redistributed among the class
  members who did file claims.
- Escheat -- Unclaimed funds go to the
  state or federal government.
- Cy pres -- Unclaimed funds are sent to a
  charity whose goals are consistent with the
  underlying causes of action.

4 Newberg on Class Actions § 12:28 (5th ed. Dec. 2021 Update).

For all of these reasons, collectively, we find no basis
for deviating from our circuit's general rule that a district
court's criticism of counsel unconnected to any challenge to a
judgment or order on appeal is not itself reviewable on appeal.
See In re Williams, 156 F.3d at 87.  That being said, an "order
determining that [an attorney] committed Rule 11 violations" is
"appealable, being distinguishable from mere criticism."  Young,
404 F.3d at 38.  So we turn now to Lieff's appeal of the Rule 11
sanction.

### III.

Lieff raises three challenges to the district court's
finding that Lieff violated Rule 11 by misrepresenting the
Fitzpatrick study in class counsel's fee memorandum supporting its
requested attorneys' fees.  First, Lieff claims that the district
court imposed the sanction without proper notice or an adequate
opportunity to respond, in violation of Rule 11 and due process.
Second, Lieff contends that it had no relevant Rule 11 obligation
because only Labaton as Lead Counsel "signed" the filing.
Finally, it defends its actions substantively, arguing that the
memorandum was not misleading and did not violate Rule 11.

This court reviews "Rule 11 orders . . . [for] 'abuse of
discretion' as to either violation or sanction; but both a mistake
of law and a clearly erroneous finding of fact constitute such an
abuse."  Id. at 38 (citing Cooter & Gell v. Hartmarx Corp., 496

- 15 -

U.S. 384, 402 (1990)).  For the following reasons, we find that none of Lieff's three challenges succeeds in establishing any such abuse of discretion.

### A.

Rule 11(c)(1) provides, in general, that a sanction under the rule can only issue "after notice and a reasonable opportunity to respond."  Rule 11(c)(3) more specifically provides that a district court on its own initiative "may order an attorney . . . to show cause why conduct specifically described in the order has not violated Rule 11(b)," the substantive provision of the rule.  As the 1993 Advisory Committee Notes state, "The power of the court to act on its own initiative is retained, but with the condition that this be done through a show cause order."

The district court provided the following relevant notice to Lieff:

- First, in a February 2017 order setting a hearing to give class counsel the opportunity to object to the appointment of the special master or to the proposed terms of that appointment, the district court explicitly stated -- twice -- that, after receiving a report and recommendation from the special master and providing counsel the opportunity to be heard, the court would consider

"if misconduct has been demonstrated [and] whether sanctions should be imposed."

- After the hearing, in which Lieff did not object to the appointment of the special master according to those terms, the district court ordered the special master to investigate, inter alia, "the accuracy and reliability of the representations made by the parties in their requests for awards of attorneys' fees and expenses" and to consider "whether any misconduct occurred in connection with such awards" and, if so, "whether it should be sanctioned."  The court expressly cited Rule 11(b)(3) & (c).

- Two years later, after the report came in and the amicus raised the issue with the Fitzpatrick study, the court issued an agenda for three days of live testimony.  The first topic to be discussed included "whether Consumer Class Counsel [including Lieff] misrepresented a study in their memorandum in support of attorneys' fees."

Lieff concedes that the foregoing put it "on notice of the need to defend the fees as reasonable," but it claims that it "had no notice that it needed to defend itself under Rule 11." That distinction is untenable.  The court repeatedly explained to Lieff, over the course of two years, that it would consider whether

- 17 -

any misconduct in the original fee application warranted sanctions -- specifically flagging "the accuracy and reliability of the representations" made by class counsel in its filings.  It also specifically warned class counsel that it would ask them to address whether they "misrepresented" the Fitzpatrick study.

Lieff certainly responded as if it well understood what was at stake.  It defended its characterization of the study to the fullest by hiring experts, submitting memoranda of law, and arguing extensively in open court.  In support of its position that its description of the study was not misleading, Lieff explained to the district court that it had given the court "a copy of [the study] in full," that "there are any number of ways one could cite to the Fitzpatrick study," that there were only "eight data points" supporting the lower mean and median, that they not only relied on the Fitzpatrick study, but also "gathered together all of the 1st Circuit cases that were mega fund cases as of that period in time," and that their statement was within one standard deviation of the numbers in the Fitzpatrick study.  On that last point on statistics, Lieff had Professor Fitzpatrick himself file a declaration supporting its position.

Each of these arguments was trained on rebutting the district court's concern that the original fee memorandum misrepresented the study.  Had Lieff only believed it needed to defend the fee, there would have been no reason to retain

Fitzpatrick as an expert or to vigorously explain how it had originally provided the court with context to the allegedly misleading statement. That the district court found none of Lieff's arguments persuasive (and declined to consider the expert's declaration because the representation in the offending memorandum spoke for itself) does not mean Lieff was not on notice or did not have an opportunity to defend itself.

The worst that might be said of the notice given is that it never included the words "show cause." But any lawyer reading what the court did say would have known -- as Lieff clearly knew based on its comprehensive response -- that it needed to demonstrate why it should not be sanctioned for misrepresenting the study. Lieff points to no precedent requiring the use of the words "show cause." And were there such a magic-word requirement, on this record Lieff can point to no harm at all due to the "violation" of such a requirement.

For the foregoing reasons, we find that the district court met the important requirement that it give both notice of the basis for a possible sanction and a fair opportunity to show why there should be no sanction, even though the court did not invoke the rule's preferred terminology. Cf. In re Taylor, 655 F.3d 274, 286 (3d Cir. 2011) (holding that, under the bankruptcy equivalent of Rule 11, an order that "was clearly in substance an order to show cause, even if it was not specifically captioned as

such," was sufficient as long as it gave "notice of exactly which
conduct was alleged to be sanctionable" (quoting <u>Fellheimer,
Eichen & Braverman, P.C.</u> v. <u>Charter Techs., Inc.</u>, 57 F.3d 1215,
1225 (3d Cir. 1995))); <u>Kaplan</u> v. <u>DaimlerChrysler, A.G.</u>, 331 F.3d
1251, 1257 (11th Cir. 2003) ("While formal compliance with [the
procedural requirements of] Rule 11(c)[] is the ideal, we apply a
flexible standard, so in many cases substantial compliance may
suffice." (internal citations omitted)); <u>Precision Specialty
Metals, Inc.</u> v. <u>United States</u>, 315 F.3d 1346, 1354 (Fed. Cir. 2003)
(declining to set aside a Rule 11 sanction based on a "technical
violation" of its procedural requirements because the attorney
"admit[ted] that, based upon the court's statements at the hearing,
she was aware that the imposition of sanctions was in the court's
mind").

## B.

Lieff's argument that it did not sign the memorandum in
support of the fee award, and thus cannot be liable for any
misrepresentations contained within, goes nowhere. Rule 11(b)
applies to anyone who "present[s]" a paper to a court "whether by
signing, filing, submitting, or later advocating it." Lieff
allowed its name and the names of three Lieff attorneys (including
Robert Lieff himself) to be placed on the signature page of the
challenged papers, which sought millions of dollars in fees for
Lieff. Lieff advocated that the court do as urged in the

challenged writing.  Indeed, at the hearing in which it was asked to defend itself, Lieff repeatedly referred to what "we" said in the memorandum.  The absence of Lieff's penned signature provides no defense to the finding that Lieff presented the problematic assertion to the court.[2]

### C.

We turn, finally, to Lieff's contention that its conduct in presenting and arguing in favor of the fee memorandum was not sanctionable.  As relevant here, Rule 11(b) "prohibits . . . the assertion of factual allegations without 'evidentiary support' or the 'likely' prospect of such support." Young, 404 F.3d at 39. But Rule 11 "is not a strict liability provision"; "[a] lawyer who makes an inaccurate factual representation must, at the very least, be culpably careless to commit a violation." Id.  Although the district court did not explicitly find that Lieff was at least

---

[2] Our conclusion that all counsel listed on the signature page "presented" the memorandum is not to say that a lawyer's limited role as secondary counsel can never bear on the extent to which that lawyer must independently investigate the representations made in the document. See, e.g., Fed. R. Civ. P. 11 advisory committee's notes to 1983 amendment ("[W]hat constitutes a reasonable inquiry may depend on . . . whether [the lawyer] depended on . . . another member of the bar.").  Although a particular lawyer's limited role in joining a presentation to the court is relevant to gauging the reasonableness of that lawyer's conduct, it does not inoculate the lawyer from Rule 11 scrutiny.  And here, as discussed in the following section, in seeking to be awarded millions of dollars that would otherwise go to its clients, Lieff was plainly aware of both what the memorandum said about the findings of the Fitzpatrick study and what the findings were.

"culpably careless" in presenting the fee memorandum, we read the court's conclusion that Lieff violated Rule 11 as encompassing such a finding.  Lieff does not contest this point and, in fact, reads the district court's opinion to have "found . . . intent to mislead."

In conducting our review in this case, we begin with an important point of context.  Lieff's fee memorandum containing the allegedly misleading statement concerning the Fitzpatrick study was made ex parte, with the distinct possibility that no adversary would ever offer any meaningful opposition.  The defendant, having bought peace, had no dog in the hunt for fees.  Before the pertinent hearing, the district court stressed this point repeatedly, noting that once a settlement occurs "the adversary system doesn't work," and that the court was therefore "relying heavily on [counsel's] submissions."

The court's need to rely on counsel in this ex parte proceeding left it vulnerable to being misled, whether by affirmative misrepresentation or by half-truths that deceived through their incompleteness.  The applicable rules of ethics called for an elevated level of candor as a result.  See Mass. R. Prof. C. 3.3(d) ("In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse."); id. cmt. 14A (deeming a petition to

approve a class action settlement to be an ex parte proceeding);[3]
see also Me. Audubon Soc'y v. Purslow, 907 F.2d 265, 268 (1st Cir.
1990) ("Where counsel appears ex parte, however, the customary
checks and balances do not pertain -- and the court is entitled to
expect an even greater degree of thoroughness and candor from
unopposed counsel than in the typical adversarial setting.").  See
generally Gregory P. Joseph, Sanctions: The Federal Law of
Litigation Abuse § 7(C)(4) (6th ed. 2021) ("When counsel appears
unopposed, a stricter standard of scrutiny . . . may be applied
due to the absence of opposing counsel to correct even inadvertent
mistakes.").

          The factual allegation at issue here is the statement
made in the fee memorandum submitted by all class counsel stating
that "[t]he 24.85% fee requested is right in line with Professor
Fitzpatrick's findings."  As support for this statement, the
memorandum -- citing the Fitzpatrick study -- explained to the
court:

> An in-depth review of all 688 class action
> settlements in federal courts during 2006 and
> 2007 found that the mean and median fees
> awarded in the 444 settlements where the POF
> method was used (either with or without a
> lodestar cross-check) were 25.7% and 25.0%,
> that the mean and median fees awarded in
> securities cases (233 of 444) were 24.7% and

---

[3]    The United States District Court for the District of
Massachusetts, through Local Rule 83.6.1(a), has made the
Massachusetts Rules of Professional Conduct applicable to
attorneys practicing before it.

25.0%, and that the mean and median fees
awarded in consumer cases (39 of 444) were
23.5% and 24.6%.

What the memorandum failed to say was that Fitzpatrick more aptly
found that in settlements between $250 million and $500 million --
like the one here -- the mean fee award was 17.8% and the median
award was 19.5%.  Fitzpatrick, supra, at 839.  The memorandum also
neglected to mention that Fitzpatrick found an inverse
relationship between fee percentages and settlement amount.  Id.
at 843.

Viewed in context, the fee memorandum painted a
materially misleading picture.  An award of 24.85% was not "right
in line" with Fitzpatrick's relevant "findings."  Rather, it was
many millions of dollars more than those findings.  And we can see
no reason to have worded the submission as it was other than to
cause the court to believe the contrary.

Of course Lieff did not actually say in so many words
that the figures it used were the most relevant.  It also
submitted, as Lieff highlights on appeal, the complete study itself
(albeit as part of over 1,000 pages of exhibits).  And its citation
of many cases included one published opinion in which the district
court in this case -- had it had plenty of time on its hands --
might have found the more relevant Fitzpatrick findings.  Lieff

also points out that the numbers it used were "within one standard deviation" of the more relevant numbers.[4]

In the typical adversary setting, excuses of this type might carry the day even if not to counsel's credit. Courts need to minimize the number of distracting sideshows that a robust insistence of forthrightness might produce. And pursuit of sanctions by a court can alter the court's more customary relationship with counsel and its role as neutral decisionmaker. So it is fair to say that courts often and wisely inure themselves to those unfortunately frequent occasions when counsel slide their toes over the uncertain line that separates fair advocacy from deception. Of course, in an adversary proceeding, we doubt Lieff would have offered and described the study as it did. If it had, opposing counsel likely would have disclosed the fuller picture, thereby undercutting Lieff's overall credibility. Cf. United States v. Marchena-Silvestre, 802 F.3d 196, 203 (1st Cir. 2015) ("[T]he . . . argument is like the thirteenth chime of a clock: you not only know it's wrong, but it causes you to wonder about everything you heard before.").

_____

[4] Lieff also excuses its statement by noting that it provided other evidence -- including its own survey of comparable First Circuit cases -- that supported the 25% rate. But the statement at issue referred solely to Fitzpatrick's findings. That it presented other support for its requested fee award has no bearing on whether it misrepresented the study.

In any event, we need only hold that in this ex parte proceeding the record supports the finding that Lieff "at the very least [was] culpably careless" in describing the Fitzpatrick study.  See Young, 404 F.3d at 39.  The description was materially misleading.  And, as the district court noted, in two prior cases Lieff had fully and accurately presented Fitzpatrick's findings, which gave those courts the opportunity to consider which aspects of the study's findings were most apt.  See Mem. in Supp. of Lead Settlement Counsel's Mot. for Att'ys' Fees at 28, In re Bank of N.Y. Mellon Corp. Forex Trans. Litig., No. 12-md-02335 (S.D.N.Y. Aug. 17, 2015), ECF No. 619 (discussing the relevant mean and median award for mega fund cases); Suppl. Submission Concerning Class Counsel's App. for Att'ys' Fees Ex. C ¶ 16, In re Neurontin Mktg. and Sales Pracs. Litig., No. 04-cv-10981 (D. Mass. Oct. 27, 2014), ECF No. 4299 (same); see also In re Neurontin Mktg. and Sales Pracs. Litig., 58 F. Supp. 3d 167, 171–72 (D. Mass. 2014).[5] In seeking to deprive this district court of such an opportunity, Lieff provided the court with a record that supports the formality

---

[5]  The Neurontin decision even provided forewarning to Lieff that a court would find the lower statistics for mega fund cases to be important.  58 F. Supp. 3d at 172 ("Importantly, however, the [Fitzpatrick] study also broke down fee award data according to the size of the settlement fund, and found that for settlements between $250 million and $500 million, the mean percentage was just 17.8%.").

of a measured declaration of a Rule 11 violation without any monetary penalty.

### IV.

For the foregoing reasons, we <u>dismiss</u> as unappealable Lieff's claims regarding the district court's mere criticisms and <u>affirm</u> the district court's Rule 11 sanction.  As there was only one party on appeal, no costs are awarded.